### BALDWIN LOCOMOTIVE WORKS v. MISSOURI, O. & G. RY. CO. et al.

(District Court, E. D. Oklahoma. November 1, 1920.)

No. 2022.

1. **Railroads** ⚙️➛30—**Trustee under reorganization plan may be a nonresident.**

   Under a railroad reorganization plan, the residence of a trustee for stock in the new company is not required to be in the court's judicial circuit, and the custom is to the contrary.

2. **Railroads** ⚙️➛30—**Trustee in reorganization proceedings selected by court.**

   A railroad reorganization plan, permitting a majority of the bondholders in the old company to select stock trustees, and allowing the court to make minor changes in the plan, does not authorize such a selection, where less than a majority of the bondholders concur; but, where it appears that the consenting bondholders probably represent a majority of the bonds now existing, the court will appoint the trustees recommended by such bondholders, under a provision of the reorganization plan authorizing the judge to appoint and discharge stock trustees.

Suit by the Baldwin Locomotive Works against the Missouri, Oklahoma & Gulf Railway Company and others, in which receivers were appointed. On petition by the Fidelity National Bank & Trust Company, and Henry C. Flower, Lester W. Hall, and George T. Tremble, trustees. Petition dismissed.

Justin D. Bowersock and Jules Rosenberger, both of Kansas City, Mo., for complainants.

Frank Hagerman and Henry L. Jost, both of Kansas City, Mo., and George H. Williams, of St. Louis, Mo., for defendants Frank Hagerman and B. Haywood Hagerman.

Arthur Miller and Maurice H. Winger, both of Kansas City, Mo., for defendant New.

Scarritt, Jones, Seddon & North, of Kansas City, Mo., for American Car & Foundry Co. and Barney & Smith.

⚙️➛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Warner, Dean, Langworthy, Thomson & Williams, of Kansas City, Mo. (O. H. Dean and Roy D. Williams, both of Kansas City, Mo., of counsel), for Day and Hoffman.

George H. Williams, of St. Louis, Mo., for St. Louis Union Trust Co.

New, Miller, Camack & Winger, of Kansas City, Mo., for defendant Kansas, O. & G. Ry. Co.

HOOK, Circuit Judge. On March 30, 1920, counsel for the Fidelity National Bank & Trust Company of Kansas City, Mo., and Henry C. Flower, Lester W. Hall, and George T. Tremble, trustees, advised William C. Hook, United States Circuit Judge, of their desire to present a petition to be filed in the receivership case of the Missouri, Oklahoma & Gulf Railroad in the United States District Court for the Eastern District of Oklahoma. On March 31 counsel was directed first to file it with the clerk of the court at Muskogee, and to advise the judge of its general purport, so that he might estimate the time proper for a hearing. This direction was upon the assumption that it was an orderly pleading in seemly terms for the redress of grievances. It subsequently appeared that counsel had previously mailed the petition to the clerk; also that he had done so as a matter of right, and as not subject to the equity practice regarding interventions. An exhaustive hearing of the matter was had at Kansas City April 12 to 15, 1920, and every reasonable aid and indulgence to its full presentation was accorded. A transcript of the evidence at the hearing was not received by the judge until shortly after the middle of July, 1920. Since that time consideration has been given it as promptly as consistent with the demands of other public business. The following is a brief review of the case of the Missouri, Oklahoma & Gulf railroads:

The railroads comprise a system of about 329 miles, extending from Baxter Springs, Kan., across Eastern Oklahoma, to Denison, Tex. They were owned by four railroad companies, organized by or in the same interests to make a connected line. The stocks in the companies were directly or indirectly owned or controlled by William Kenefick and his associates. The enterprise became insolvent, and on December 11, 1913, the Baldwin Locomotive Works filed a creditor's bill in the United States District Court for the Eastern District of Oklahoma, for the appointment of a receiver and the marshaling of assets. Mr. Kenefick, as the moving spirit in the construction of the railroads, was appointed receiver by consent of the parties. The St. Louis Union Trust Company, of St. Louis, Mo., was the trustee in several mortgages on the railorads constituting the system, securing issues of first mortgage bonds, of which $12,241,100 had been marketed and were outstanding in the hands of purchasers. On January 2, 1914, the St. Louis Union Trust Company, as trustee, filed an intervening petition to preserve the unity and integrity of the properties. The original bill of the Baldwin Locomotive Works and the intervention of the St. Louis Union Trust Company, trustee, were consolidated. On January 8, 1914, the complainants, Baldwin Locomotive Works and St. Louis Union Trust Company, the receiver, William Kenefick, a

reorganization committee of bondholders, other large bondholding interests, and unsecured creditors appeared before the court. Mr. Kenefick voluntarily retired as receiver. Counsel for the parties above mentioned thereupon recommended the appointment of Mr. Alexander New and Mr. Louis S. Posner as receivers. Their recommendations were entered in the record of the cause and the appointment was made the same day. Mr. New was regarded as being favored by Mr. Kenefick, and Mr. Posner was a partner of Mr. John R. Dos Passos of New York, who represented a French committee of bondholders holding several million dollars of the first mortgage bonds.

The financial condition of the railroad companies and the physical condition of the properties were so very bad that the question of the issue of receivers' certificates soon arose. The proposal to issue such certificates originated with the parties in interest, and not with the court. The court neither took the initiative nor recommended the measure. On the contrary, it declined to authorize the issue of receivers' certificates unless and until all the important interests in the property, including the first mortgage bondholders, joined in or expressed their approval of record. It was generally understood that nearly all of the first mortgage bonds had been marketed abroad, the great majority of them, about $10,000,000 in the provinces of France and in Belgium, and there was difficulty in definitely ascertaining who owned or held them. Consequently on January 4, 1914, the court appointed Mr. Herman C. Huffer to make inquiry and report upon the ownership of the bonds, or who represented the bondholders, to the end that their view regarding the issue of receivers' certificates on property in which they were so heavily interested might be ascertained. Mr. Huffer was related to L. Huffer & Co., of Paris, France, which itself owned and represented a considerable amount of the bonds, and whose counsel in this country was Mr. George Whitelock, secretary of the American Bar Association. Mr. Huffer went abroad in 1914, and after much difficulty succeeded in locating the owners of the larger part of the bonds or their representatives. He made three reports to the court, showing finally the owners or representatives of $9,322,400 out of a total of $12,049,600 sold abroad, leaving $2,717,200 unlocated.

An application for authority to issue $1,750,000 of receivers' certificates was filed December 3, 1914. It was consented to by the railroad companies constituting or controlling the Missouri, Oklahoma & Gulf system, by the construction companies owning a majority of their capital stocks, by the St. Louis Union Trust Company, trustee in the first mortgages, in a qualified way and to the extent of its authority in the premises, by the representatives of a majority of the outstanding first mortgage bonds, and by a large number of intervening creditors claiming a lien on the railroad properties. These consents were entered upon the record of the cause, and on February 19, 1915, an order authorizing the issue of the certificates was made. A few days afterwards $750,000 of the certificates were sold to the Fidelity Trust Company, of Kansas City, Mo., at 94 per cent. of their face value; the price being the best obtainable, and having been consented to by the parties in interest similarly to the consent authorizng their issue. On February 23, 1915, Mr. Posner resigned as receiver, and a few

days later Mr. Henry C. Ferris was appointed in his place. This change was made at the instance of representatives of the foreign bondholders, and particularly at the suggestion of gentlemen who were endeavoring to reorganize the property, one of whom was an experienced railroad man of national reputation. Mr. Ferris was highly recommended to the court as a practical operating railroad man. He was at once put in charge of the road and of the immediate expenditure on the property of the proceeds of the receivers' certificates so far as available for that purpose.

The Missouri, Oklahoma & Gulf was heavily indebted to the Baldwin Locomotive Works, the Barney & Smith Car Company, and the American Car & Foundry Company for rolling stock and locomotives sold on the customary equipment contracts of lease or conditional sale. On February 20, 1915, the aggregate of such indebtedness, with interest, was a little short of $1,000,000, of which $743,034 was principal. The three equipment companies agreed to take $250,000 of the receivers' certificates at par and apply the amount on their claims. On April 26, 1915, the receivers, Mr. New and Mr. Ferris, were authorized to consummate the transaction, and it was done. This left $750,000 of certificates authorized, but not disposed of. On October 16, 1915, the receivers filed a voluminous petition, setting forth in itemized detail the repairs and improvements necessary for the property in their possession, and asking authority to sell $500,000 of the remaining certificates to the Fidelity Trust Company at the same price as before, and to apply the proceeds on the work. The order was entered and the certificates sold accordingly. Subsequently additional certificates were similarly sold, until the amount outstanding was $1,720,000.

It may be observed that, when the receivers were appointed, the railroad property was in very bad physical condition. It was impossible to operate it and comply with the public statutes, or to operate it at all except at a heavy and constantly growing loss. The equipment and motive power were run down. The companies had no shops or other facilities for making their own repairs. Engines had to be sent to other railroads to be overhauled. More than half of the railroad mileage was unballasted, and considerable of it embedded in the earth. In December, 1916, 156 main line derailments were reported to the Oklahoma Corporation Commission. The court was informed that the chairman of the commission had expressed the view that the condition of the railroad made it a public nuisance and its operation should be stopped. The supports under steel bridge spans had sagged, and there was great difficulty in restoring and maintaining necessary parts of the railroad against destruction by floods. These, with many other similar physical conditions, and financial conditions in keeping with them, presented a serious task for the receivership. The major part of the proceeds of the sales of receivers' certificates were applied as soon as possible toward the restoration of the property, a very large percentage to necessary ballasting. Such debts as threatened its integrity were paid with the assent of the parties. From time to time the receivers made reports of their expenditures and the purposes for which

they were made, which met the approval of the court and apparently of all the parties. No objections were made to them by any party.

The efforts at reorganization, originating with the parties in interest, failed because of the war in Europe, which was growing in intensity. Consequently a general conference was called for April 11, 1917. It resulted in the following order made of record in the cause:

"Order.

"This cause came on for hearing this April 11, 1917, upon a general conference between the receivers, mortgage trustees, parties to the causes, representatives of bondholders, creditors, and stockholders. The conference was called by the receivers, at the request of the court, to consider what steps should be taken to speed the cause to final hearing and close the receivership. Thereupon the court, after announcing the purpose of the conference, stated to those present that the receivership had already continued an unusual length of time, because most of the first mortgage bondholders were citizens of European nations at war since August, 1914, and have not been personally accessible, but that it should not be further continued indefinitely, even for that reason, if it can be wound up with substantial justice to all interested, whether present or not. At the request of the court there was a general expression of views by those present. It appeared that a large part of the first mortgage bonds were held in small amounts by residents of France, Belgium, and Great Britain, particularly the former; that prior to the beginning of the war some steps had been taken on behalf of the bondholders and stockholders to reorganize the property of the defendant railroad companies; that the efforts appear to have been abandoned; that some substantial amount of new capital is imperatively necessary for such a reorganization, and to enable the railroads to be operated as a going concern and to perform their duties to the public; that it is impossible for the first mortgage bondholders to raise the new capital now, or within any definite, reasonable period in the future, nor, considering the value of the property and existing financial conditions, is it practicable to raise such funds by assessment upon or voluntary subscriptions from the second mortgage bondholders, the creditors, or the stockholders. The conclusion, concurred in by most of those who spoke upon the subject, was that no organized effort on the part of the security holders to reorganize the properties and close the receivership could reasonably be expected within any definite period of time, and that it remained for the court to take action. That is also the view of the court. It is therefore ordered:

"(1) The St. Louis Union Trust Company, trustee, hereby consenting and having authority to do so, shall promptly file herein a bill or bills for foreclosure and speed the same to hearing and decree.

"(2) The receivers herein are directed to employ some one of competent legal ability to prepare and submit to the court for its consideration and determination a plan of reorganization of the properties in their hands as fair and just to all as conditions will permit. The plan in general outline shall contain provisions for the raising and securing of such new capital as may be vitally necessary, for the recognition of the existing security holders and creditors, so far as practicable, considering the value of the property, for the equitable adjustment of their respective relations to the property, giving the security holders, particularly the holders of first mortgage bonds in Europe, such time and opportunity to avail themselves of the provisions made for them as can reasonably be given, and for the future corporate government and control of the reorganized corporation or corporations.

"April 11, 1917.        William C. Hook, United States Circuit Judge."

Pursuant to the above order the receivers employed Mr. Frank Hagerman, of Kansas City, Mo., to prepare a plan of reorganization for submission to the court, and on June 27, 1917, the St. Louis Union Trust Company, trustee, filed bills for the foreclosure of the mortgages. Mr. Hagerman prepared a plan of reorganization and several

modifications of it, but was unable to satisfy the conflicting interests to such an extent that they would accept it. A meeting largely attended by the parties or their representatives from the East and the Middle West was held at St. Paul, Minn., in May, 1918, when the failure of the receivers' plans was reported, and the judge of the court undertook to solve the difficulties by a formulation of a plan himself. The problem to be met was three-fold: First, the securing of new funds, which, under the conditions then existing, could only be obtained from the United States Railroad Administration, this because cash assessments customary in such reorganizations were impracticable; second, the adjustment of conflicting interests prior to the old first mortgage bonds, including the costs and expenses of reorganization, receivers' certificates, receivers' liabilities, etc.; third, the treatment to be accorded the old first mortgage bonds, held almost wholly in Europe and many then in the immediate theater of the war. The amounts to be obtained, if possible, from the Railroad Administration, were fully discussed at the meeting in all their bearings, and also the methods of reconcilement of the other interests. It was a difficult problem, and the judge devoted much time to it and to the matters which immediately arose under it.

A plan was prepared, dated August 31, 1918, and first officially submitted to the Railroad Administration at Washington for its consideration. It was conditioned upon the making of a contract with the Railroad Administration for operation during federal control and for advancement or loan of the necessary funds. The arrangements were finally made with the Railroad Administration, and consummated December 21, 1918, by a signed memorandum of agreement, to be a part of the standard form of contract when executed. It may be said here that the Railroad Administration afterwards abandoned the practice of standard contracts, and substituted particular settlements in their place. This, however, did not affect the agreement of December 21, 1918. The plan was changed in a few respects, to make it harmonize with the agreement, and it was formally promulgated December 31, 1918. The Railroad Administration expressly approved the plan. The railroad was taken under federal control as of the following day, January 1, 1919. The plan and the agreement fixed the amounts the Railroad Administration was to advance or loan and the purposes, and provided that the government should have a paramount lien. A new company was to be organized to bid for the property at the foreclosure sale, and if successful to take title. The major part of the allowances and costs in the receivership, which ordinarily are first paid, were by those entitled to them voluntarily reduced to the class of receivers' certificates and other receivers' liabilities, to which were given class A bonds of the new company, next in security to the paramount lien of the government. Provision was made in the plan that other claims determined to be prior in lien or equity to the old first mortgage bonds should be paid in class B bonds of the new company, next in lien to class A. The holders of the old first mortgage bonds were to receive half of the principal of their holdings in class C bonds, inferior in lien to A and B, and for the balance and accrued interest were to have

the preferred stock of the new company. That stock will constitute the great controlling majority.

Ample opportunity was accorded the foreign bondholders to avail themselves of the plan and to save their equity in the property. There were other and minor provisions, but the above in general is the financial structure of the plan of adjustment. Large powers were conferred upon the judge to carry out and consummate the plan, including the appointment of trustees to hold and control the stock of the new company until it should be finally surrendered to those ultimately entitled to it. These powers were conferred upon the judge, not upon the court in which the receivership was pending, and upon his death or disability to act they devolve, not upon the court, but upon his successor in office. · Assurances were given by creditors from time to time of their assent to the plan. A meeting was held in May, 1919, also largely attended, at which suggestions and objections were heard and considered, and the plan was formally declared fair, equitable, and operative. For the information and convenience of the parties, the plan and the subsequent orders marking steps in its consummation were filed with the clerk of the court at Muskogee, Okl., regardless of whether they pertained to the receivership or not.

Mr. Ferris resigned as receiver, effective January 1, 1919, and became the operating superintendent under the Railroad Administration. On April 15, 1919, a final decree of foreclosure of the old mortgages was entered. An order of sale was issued, and on July 8, 1919, the commissioner sold the property to Arthur Miller, Esq., who acted on behalf of the plan of adjustment and the new company to be formed under its provisions. On July 31, 1919, the new company, by the name of the Kansas, Oklahoma & Gulf Railway Company, was organized, and the title was thereupon conveyed to it. It may be observed here that, as customary, the first directory of the company was intended as temporary, and under ordinary circumstances would soon have given way to one more permanent and representative. On December 1, 1919, the judge appointed the three stock trustees under the plan of adjustment, one of whom was the Fidelity National Bank & Trust Company, a petitioner in this case.

It is not necessary to take up the petition in detail. Its character and the truthfulness of its charges are sufficiently illustrated by what will be said. The petition charges that Mr. Hagerman was counsel for the Banque Franco-Americaine; that between the Banque and the railroad companies large unsettled demands existed when the receivers were appointed; also that the Banque or its successor was still (March 31, 1920) asserting claims against the railroad companies or the receivers, and was claiming preferential liens and bonds of the new railroad company equal in rank to the bonds allottable under the plan of adjustment to the petitioners. The manifest intention of the petitioners was to charge that Mr. Hagerman was guilty of gross professional misconduct, in that he was pretending to serve at the same time two sides in a case having conflicting interests—the receivership, in which all creditors were interested, on the one hand, and on the other a personal client, whose demands were adverse to the interests of the

other creditors, and particularly to the interests of the petitioners. The court record in the case, accessible to everybody, plainly shows the charge to be untrue in both letter and spirit. This is so manifestly the case that there was no justification for making the charge, much less for putting it in the records of a court of justice. After giving publicity to the charge, there was no serious attempt to prove it. The facts in the matter are these:

Before the receivership, the railroad companies had employed the Banque Franco-Amercaine, of Paris, France, as an agency to market their bonds. When the receivership came, the Banque had in its possession unsold several million dollars of the bonds of the companies, and also had claims against them for various disbursements made and liabilities incurred. The necessity of adjusting the accounts and of getting possession of the unsold bonds, so they could be canceled and no longer exist as an apparent charge upon the property, was made the subject of averment in the first pleading filed in the case—the bill of complaint of the Baldwin Locomotive Works. The Banque Franco-Americaine went into liquidation, and Mr. J. Dumas, of Paris, became its liquidator. On February 19, 1915, Mr. Hagerman, as counsel for Mr. Dumas, filed in the receivership cause a detailed statement of the matter and a proposition of adjustment. The parties to the cause—that is to say, the plaintiffs Baldwin Locomotive Works and the St. Louis Union Trust Company, trustee, the defendant railroad companies, the French committee of bondholders, and the receivers, all recommended that the adjustment be made. Their recommendations were in writing, and were put of record in the cause. On the same day the court made an order authorizing the adjustment. The claim of the Banque Franco-Americaine thereupon disappeared as a disputed matter in the cause. This was more than two years before Mr. Hagerman was employed to act for the receivers in the matter of the reorganization. The amount allowed in the adjustment was for taxes imposed by the republic of France on the sale of the railroad bonds in that country, for which the Banque Franco-Americaine had obligated itself. No claim has ever been made by or for it, or Mr. Dumas, its liquidator, as is alleged in the petition, that they should have class A bonds of the new company under the plan of adjustment, or that they should have, in the language of the petition, "bonds of equal rank with bonds of your petitioners." Moreover, no such claim could be made or allowed under the plan. Every reasonable person interested in the case and in the reorganization of the railroads knows this to be so.

There is much more in the petition designed to reflect injuriously upon the integrity of Mr. Hagerman and upon the propriety of his employment in the receivership and the reorganization. Most of it is in general terms, interwoven here and there with specific averments, some of which are wholly untrue, and others partly true, but where the full truth would deprive the averments of all bearing or significance. A single instance of the latter will suffice to show their character. For example, the petition charges the following:

"Said Hagerman also, at the special instance and request of said judge, negotiated with the officers of the United States Railroad Administration

for extensive loans to be made to the receivers, or the new company referred to in said plan, and for the terms of compensation to be paid by the government for the use, during the period of government control, of the railroad property in the hands of the receivers; said loans to be secured by a paramount lien on said property."

Elsewhere in the petition is the following averment:

"The amount of the government lien authorized to be secured as a paramount lien under said plan will not be less than $2,280,000."

In a qualified sense the first averment is true; but it is not all of the truth. Known facts were omitted, so that an untrue inference was necessarily conveyed by the averment, taken with the balance of the petition. The inference conveyed by the language employed is that, at the instance of the judge, Mr. Hagerman dealt with the Railroad Administration without the consent or participation of the petitioners and other creditors, and arbitrarily negotiated the terms of compensation for government control, and also for large loans, which were made paramount liens upon the property ahead of the receivers' certificates. The facts are these:

It was known by all that funds from some source were essential to any effective plan of reorganization, and all knew that the funds could not be raised by assessment upon the creditors, the bondholders, or the old railroad companies, as is customary in other reorganizations of railroads. Those conditions were conceded by all. Government control of railroads, which began January 1, 1918, and the power to advance or loan moneys to the carriers, furnished a way out. At the open meeting in May, 1918, attended by representatives of the principal creditors, bondholders, and other interested parties, including the Fidelity Trust Company, the above situation was fully discussed in connection with a plan of adjustment to be formulated by the judge. Amounts and purposes were fully discussed.

The position of the court, always maintained and never departed from, was that it would contract for no loans from the Railroad Administration to be secured by a lien prior to the receivers' certificates, except pursuant to a plan of adjustment acceptable to a sufficient number of the creditors, including the holders of the certificates, to make the plan effective, and that in such case the loans and paramount lien would be at the instance of and on behalf of the creditors themselves, instead of through an arbitrary exercise of power by the court or judge. That position was definitely made known to the Railroad Administration on June 29, 1918, at Washington, whilst the judge was working on the plan of adjustment which was afterwards promulgated.

The plan prepared by the judge was completed August 31, 1918, but the negotiations with the Railroad Administration were not completed until December 21, 1918, when the written agreement was signed. The plan was thereupon modified in a few particulars to conform with the agreement, and finally dated and promulgated December 31, 1918. The agreement with the Railroad Administration specifies the sums of money to be loaned and the purposes. According to express terms in the agreement, $255,000 was loaned that day, December 21, 1918, of which $225,000 was imperatively needed to meet back pay awarded

employees, who were threatening to strike because of delay in paying them, and taxes due January 1, 1920. This was the first money obtained from the Railroad Administration. It may be stated broadly that no money was then or thereafter borrowed from the Railroad Administration, except with the consent, formally or informally expressed, of a sufficient amount of creditors, including those holding receivers' certificates, to make the plan of adjustment effective.

That this is true as to the petitioners appears from the following: The Fidelity Trust Company, whose interests are now represented by the individual petitioners, employed counsel, who went to Washington and ably aided Mr. Hagerman in the arguments and negotiations that resulted in the agreement of December 21, 1918, under which the moneys loaned by the Railroad Administration were obtained, and which in terms provides for a first lien on all the property of the new railroad company. How well calculated, therefore, to misrepresent and deceive, is the allegation that at the instance of the judge said Hagerman negotiated for extensive loans from the government, to be secured by a paramount lien.

As already observed, it is elsewhere alleged in the petition that the amount of this paramount lien "under said plan will not be less than $2,280,000." The averment of this large sum was calculated to aggravate the inference conveyed by the other. The plan shows on its face that the averment is not true. Moreover, the amount fixed by the agreement of December 21, 1918, with the Railroad Administration, which controls the matter and of which petitioners had full knowledge, is less than $1,500,000. Accurately, the amount is $1,411,687.30, and it includes $86,687.30 of principal of equipment obligations, which, assuming that the railroad will be operated and continue as a going concern, is to that extent merely a change from one form of paramount obligation to another. The petition exaggerates the true figures by over $800,000.

It is shown that Mr. Hagerman is unfriendly to one of the individual petitioners. The averments of the petition disclose that the feeling is fully reciprocated. With it and its causes the court, the judge, and the other parties, whose interests are many times more than those of petitioners, are not concerned, except as they may obstruct or imperil the consummation of the plan of adjustment. The feeling has not been allowed to affect the legal rights of the petitioners, or to prevent them from presenting their claims and views to the court and judge, the same as other parties of all classes have felt free to do, and as has been done many times. All important acts of record in the receivership, the plan of adjustment, and steps toward consummating it have been those of the court or the judge, upon full consideration. Necessarily considerable of subordinate importance and detail had to be in the first instance intrusted to others, but always with the right to a hearing on differences that developed. That course was so necessary, and its conditions so generally understood and observed by the parties, that contentions now to the contrary have no basis in truth.

Mr. Hagerman is a lawyer of national reputation, and is universally regarded as one of eminent ability and of the highest integrity. The

breach of friendly relations above mentioned, about which much evidence was given at the hearing, occurred in 1916. Mr. Hagerman was employed for the reorganization the following year, 1917. At the hearing of the petition in April, 1920, the individual petitioner referred to, in speaking as of 1917, testified as follows:

"I regarded him as a very fit person to do it; probably the best they could have employed."

This feature of the petition need not be pursued further.

[1] Objection is made to Alexander New as a stock trustee under the plan of adjustment, because he does not reside in this United States judicial circuit. There is no requirement of such residence. Moreover, the custom is to the contrary. It is a common practice in the case of Western railroad properties to select as stock trustees men who reside in New York, and sometimes even residents in Europe. The existence of the custom is so well known that it cannot be assumed petitioners were ignorant of it. New York, where Mr. New resides, at present is the gateway into this country for the Missouri, Oklahoma & Gulf foreign bondholders, who will be entitled to most of the trusteed stocks.

Again Mr. New is assailed as a receiver. He was a receiver when the Fidelity Trust Company first negotiated with him for receivers' certificates, and from that time until this petition was filed, a period of over five years, no objection was ever made to the court that Mr. New was not qualified in every way, was not competently discharging his duties, or was not faithful to his trust. It is true that Mr. New is not a practical railroad man, but neither are any of those whom the petitioners name for appointment as officers of the new railroad company. Mr. New's associate, Mr. Ferris, was directly in charge of operations, and Mr. New, after he removed to New York, was continued as a receiver to aid efforts on behalf of the European bondholders to reorganize the railroads and to deal with the Eastern equipment companies holding, principal and interest, nearly $1,000,000 of obligations of the railroads. In this latter matter he performed a very valuable service. The removal of Mr. New as receiver is sought at this time, when the slightest inquiry would have developed the fact that after the master's sale of the railroads and the conveyance of them to the new company in 1919 his position as receiver was but a nominal one, with little or no compensation. He was continued in office after his active duties ceased, to meet possible contingencies of belated litigation, in which some one holding such a position would be a necessary party. The course is customary in receivership cases. It is unimportant who holds the position, but the litigation, if any ensues, is attended to by counsel for the new or reorganized company.

Again, it is alleged that Mr. New is "seeking large fees" as receiver. On February 19, 1915, an order was entered covering the compensation of Mr. New and Mr. Posner to that date; the latter being about to retire. No other order has been made or applied for. Mr. New is entitled to, and will be paid, compensation from that time to the day the railroad was turned over to the new company; but, on account of the financial condition of the receivership, he has not drawn it, nor

has he to this time asked that it be allowed or paid. In the offensive sense, naturally conveyed and evidently intended, the allegation is untrue.

Again it is alleged that Mr. New is a member of a certain law firm in Kansas City which, as attorneys for William Kenefick and the William Kenefick Construction Company, are "asserting claims to a large amount against the receiver, or the new company," and seeking to have them declared preferential to the old first mortgage bonds. This charge, read with others, means that Mr. New, while a receiver and also a trustee for future stockholders of the new company, to whom he owed the highest duty of fidelity and good faith, was at the same time prosecuting a claim that would lessen the value of their interests. Both phases of this charge are untrue. Mr. New has not been a member of the law firm for several years, and for several years has had no financial or other interest in its business. This could have been learned by casual inquiry of those with whom the petitioners were in daily contact. In the next place, neither Mr. New nor the law firm in question were asserting for Mr. Kenefick or the construction company any claim against the receiver or the new company. Alexander New is regarded by all who know him as one who both entertains and practices in business affairs and in private life the highest code of ethics. The attack upon him in the petition has not the excuse of a personal quarrel, and is explicable only by some ulterior purpose.

The same unfair course has been employed against Mr. Ferris, the operating receiver until January 1, 1919, then general superintendent under the Railroad Administration until the end of government control March 1, 1920, and thereafter, until recently, an official of the new company in charge of operations. The records of his management prior to January 1, 1918, and the reports to the Interstate Commerce Commission, definitely show a steady progress in the restoration of the property and the growth of its business. Mr. Ferris became a receiver March, 1915. For the year 1915 there was an operating revenue deficit of $191,216. For 1916 there was a surplus of $195,678, and in 1917 a surplus of $316,864, an increase over 1915 of more than $500,000. In 1917 there was a net income of $62,739. During 1918 the operating officials of the Railroad Administration took the position that the Missouri, Oklahoma & Gulf was not under government control, and as a result much of its natural traffic for that year was diverted to the large government-controlled railroad systems surrounding it. At the same time it was compelled to meet the increased wage schedules ordered by the government, the awards of back pay, and the rising cost of materials. It was not even allowed to route its office supplies, destined to its offices at Muskogee, Okl., over its own lines. As compared with the preceding year, 1917, a loss in net operating revenues of $547,776 was inflicted, and the net income of $62,739 was changed to a deficit of $447,838. So grievous were these conditions and so manifest the injustice to the property that an exposition of them at Washington in December, 1918, greatly influenced a change of policy by the Railroad Administration, and the agreement of December 21, 1918, was soon made. The agreement provides affirmatively for government control

as of January 1, 1919. No reasonable-minded person would hold Mr. Ferris responsible for the showing in 1918.

While Mr. Ferris was receiver, his acts were being subjected to close and unfriendly scrutiny by persons in his service, afterwards discharged. Their criticisms were detailed on the witness stand. For the most part they were so petty and meticulous that they need not be further mentioned. Two things were emphasized. Both occurred during government control, and the responsibility, if any, was to the Railroad Administration, not to the receivership or the new company. One related to the keeping of the accounts of the repair of an implement owned by him and of its use on the railroad property. The accounting method was irregular, but not dishonest. No secret was made of it. The other related to the purchase of railroad materials considerably in excess of normal. This was characterized as wasteful and improvident. It appeared that during its control the Railroad Administration had allotted $690,000 for materials and labor upon the railroad, without creating a debt of the receivership or the new company, and that Mr. Ferris was endeavoring to give the property the benefit of it while government control lasted. That course was generally pursued by the railroads of the country under government control, and if the right and opportunity was abused it would seem that complaint should originate with the government instead of with parties claiming an interest in the welfare of the property.

Two other matters in the petition and evidence at the hearing may be noticed. It is claimed by petitioners that at a general conference of parties in interest in May, 1918, assurances were given by the judge, or a statement made by him, that the Fidelity Trust Company would be appointed as one of the three stock trustees. • The date is material. The weight of the evidence shows, and the judge knows, that no such assurances were given and no such statement was made, and that nothing was said, directly or indirectly, from which such a conclusion could be reasonably inferred. The object of petitioners in this particular is obscure. It is explainable only on the theory that they claim such appointment as an element of a contract with them. What was said on that subject occurred several months later, was said to its counsel, and was not of a character from which a contract obligation could be inferred, or even a moral obligation, regardless of the conduct or attitude of that company towards the reorganization.

The other matter is this: On December 1, 1919, the judge at his chambers in Leavenworth, Kan., signed several orders relating to the reorganization and delivered them to Mr. Arthur Miller, counsel for the new company, to be filed with the clerk at Muskogee. One order was the appointment of the three stock trustees under the plan of adjustment, one of them being the Fidelity National Bank & Trust Company. Another order directed the receiver to transfer certain stock in the new company to the three trustees. The three trustees were named in this order and their trust capacity specified. The other orders related to other matters. All orders were dated December 1, 1919. Mr. Miller sent all the orders to the clerk at Muskogee, where they were filed December 11, except the first mentioned, which he mis-

placed in his office and did not discover until early in March, 1920, when he sent it to be filed. It was filed March 6, 1920.

Referring to the order appointing the three trustees, which was misplaced, the petition charges that it was concealed and suppressed by Mr. Hagerman for improper purposes, and was not discovered until counsel examined the records at Muskogee March 21, 1920. Of course, the charge is untrue. One of the individual petitioners testified that he was informed by letter as early as July 25, 1919, that the Fidelity National Bank & Trust Company would be appointed as one of the trustees, and that he immediately showed the letter to one of the other individual petitioners, both officers of the Fidelity National Bank & Trust Company; also that on November 12, 1919, he was informed who all three trustees would be. A witness for petitioners testified that in December, 1919 (after the order of appointment was signed), he told one of the individual petitioners that his institution was a trustee. The evidence at the hearing in its entirety shows that petitioners knew their institution would be appointed, and in December, shortly after the order was made, had actual knowledge of the appointment. Notwithstanding this, and Mr. Miller's statement that the oversight was his alone and was unintentional, the petitioners continued at the hearing to bring up the failure to file the order until March 6.

Counsel who examined the records at Muskogee March 21, and saw the other order, also dated December 1, and filed December 11, which recited the names of the trustees and their trust capacity, did not inform his clients of it. By itself the order which he saw was filed December 11 was legally equivalent to an appointment. Apart from the charge of misconduct in the petition, this matter may appear trivial; but its reiteration at the hearing led to an inquiry of one of the individual petitioners on the witness stand as to what prejudice could have been caused by the failure promptly to file the order. The shameful answer was made that the judge knew whether he signed the order on December 1 or not, but he immediately suspected that it had been prepared in March, and dated back of a controversy which occurred early in March with Mr. Hagerman. No more need be said of this, except that the position was so discreditable to the witness that he afterwards sought to escape from it.

Enough has been said to show that the petition was intended to be scandalous and to create a sensation in the neighborhood. It does not appear that the other interests petitioners represent joined with them in this proceeding, or approve of the methods employed. The reasonable inference is they do not. It is certain that very large interests on an equality with theirs and the representatives of the old bondholders, who will own the railroad, affirmatively disapprove. The petition is replete with false statements and statements of half truths, with misleading innuendoes and inferences. In its violence it is like what in physical activities against the government or established institutions is called "direct action." Occasionally such methods have been employed elsewhere, but fortunately the cases are not common. The redress of real grievances does not require them. Courts and judges, who have come to notice the new and exceptional practice, while

awarding justice at all times and under all circumstances, will grant nothing to violence and scandal. Real grievances lose nothing by their assertion in an orderly way.

The conduct of certain holders of receivers' certificates justifies the belief that they deliberately set about to capture this railroad from the bondholders, while the World War was on and the bondholders were powerless to protect themselves. It is admitted that, while those conditions existed, they discussed among themselves a sale and buying in of the road under their receivers' certificates. They objected to proposed plans of reorganization, unless they were put in control of the property. The crisis precipitated by the government control of railroads January 1, 1918, and the threatened exclusion therefrom of the Missouri, Oklahoma & Gulf, operated to coerce them to accept the plan of adjustment put out by the judge. This they admit, and they still say they do not like the plan. They are not in sympathy with it. Government control had hardly ceased March 1, 1920, when this proceeding was begun, and the honesty and integrity of almost every one who had prominently helped to bring the plan about, or to aid in its consummation, was attacked. · They did not wish the Commerce Trust Company, of Kansas City, Mo., selected as trustee in the lien instrument securing the United States for its advances under the plan of adjustment and the agreement of December 21, 1918, a position which did not directly concern them or their legal interests. They objected to the selection of the St. Louis Union Trust Company as the trustee in the mortgage securing the bonds of the new company. The trust company had been trustee in the mortgages of the Missouri, Oklahoma & Gulf, and, so far as it could, had aided the plan of adjustment. They objected to the connection of certain men with the receivership and the new company because of lack of railroad experience, while at the same time insisting upon selections from some of their own number equally inexperienced. Again, the judge has been recently advised that some of them were considering a contest of the application of the new company to the Interstate Commerce Commission for a certificate of authority to issue the stocks and bonds of that company specifically required by the plan of adjustment. · The granting of such authority was vital to the carrying out of the plan. So much of this has occurred in the history of this matter that it cannot reasonably be attributed to anything else than a spirit of opposition to the consummation of the plan of adjustment, which conditions forced them to accept.

[2] The petition is dismissed at the cost of the petitioners. The depositary under the plan of adjustment reports that there have been deposited with him and his subdepositaries, including the branch of the Equitable Trust Company of New York in Paris, France, first mortgage bonds of the old railroad companies aggregating $5,848,600 out of the total outstanding of $12,241,100 as specified in the plan. Counsel for committees of bondholders and of individuals holding bonds has presented a petition stating substantially the same facts; also that he is informed and verily believes that a large number of undeposited bonds have been lost or destroyed in the European war, and that the

amount deposited will prove to be a majority. He asks that the depositing bondholders may be authorized to select the voting trustees according to the provisions of the plan of adjustment. The petition and the report will be filed at Muskogee. The two individual trustees, Mr. New and Mr. B. H. Hagerman, have also advised the judge of the above figures, and that in their view the delivery of the property to representatives of the old bondholders, to whom nearly all of the stock will be issued, should be expedited by allowing them to select such officers. The plan provides that this may be done within any time fixed by the judge when a majority in amount of the holders of the old first mortgage bonds have accepted it; also that the judge might make minor changes in the plan, not affecting its substantial structure or the substantial rights of those who may have accepted it.

The judge is of the opinion that in advance of the acceptance by an actual majority of the amount of bonds specified in the plan and a verification of their holdings in some authoritative way a change in the plan such as is desired would not be a minor one within his power to make. He will, however, in view of the above representations, do what will work to the same practical end; that is to say, appoint as his appointees two trustees whose names are presented by counsel for the depositing bondholders, namely, Edmund F. Harding, Esq., and Cyril F. Dos Passos, Esq., both of New York. It is apparent that the remaining trusteeship should not be held by the corporate petitioner. At the same time it is necessary to observe the plan, which provides that one of the three trustees appointed by the judge "shall be selected from the holders of or the officers of one of the financial institutions which hold receivers' certificates." Suggestions will be received as to who should be appointed to that place. Orders carrying the above into effect will be made and filed at Muskogee.

When the railroad was turned over to the new company, it occupied a dual position. First, it was the owner and the operator of the property while not under government control. With those aspects neither the court nor the judge is interested, save in the general desire entertained by all that the operation be prosperous. But, second, the new company became a necessary agency or instrumentality of the judge in carrying out the plan of adjustment, for which he had obligated himself to the government and to every person and corporation who had accepted it. For the execution of every note, bond, lien instrument, mortgage, and certificate of stock, every essential corporate step in the plan and in the disbursement of a large sum of money advanced by the government, and not for use on the physical property, he is compelled to rely upon the new company, and therefore upon its officers, through whom alone it can corporately act. It was for this reason and to insure the carrying out of the plan that the power to appoint and displace the stock trustees was vested in him.